May I please the Court? This case arose from the decision of the District Court granting summary judgment at the close of discovery in favor of defendant on all claims. The case had arisen under the ADA and the Federal Rehab Act. In a nutshell, the plaintiff who was the senior faculty member at the University of Maryland Eastern Shore alleged that the university improperly perceived him as disabled and on the strength of that bogus perception required him to submit to an unwarranted fitness for duty evaluation that was not supported by the University of Maryland Eastern Shore. And when Professor Coursey filed a complaint with the EEOC, three months after the university learned of the complaint, they brought charges of termination. The complaint was objectively reasonable and we contend, therefore, that the ensuing action was retaliatory. The case arose somewhat unusually, not from charges of removal in the figurative sense of taking somebody out of the job, but literally with a knock on his door. When he opened it, there was a uniformed guard who told him that he was being physically removed from campus. And he was, pursuant to a letter from the university's vice president alluding to unidentified issues about inappropriate behavior in the classroom and directing Professor Coursey to stay away from campus until further orders. That was in February of 2009. On May 26th of that year, the faculty committee, who hears grievances, issued an opinion that he had been improperly removed and should be reinstated. That recommendation went to the president, who did nothing for about six weeks. And then in June of that year, wrote Dr. Coursey saying, you know what, we're just about at the end of the semester, so I'm just going to defer acting on their recommendation that you be reinstated. But meanwhile, I'm going to adopt their recommendation that you submit to a fitness for duty evaluation, a psychological slash medical fitness for duty evaluation. That prompted a letter from the chair of the committee who said respectfully, Madam President, we made no such recommendation. The president ignored the letter, and during the next five or six months, there were a number of requests through her, through her counsel, that Professor Coursey submit to an examination. He took the position that it was unwarranted and that it, frankly, was disrespectful, and he did not comply. He filed the notice of charge with the EEOC in October of 2009. On February 3, 2009, and this appears at page 373 of the record, on February 3, 2010, forgive me, the university received a copy of the EEOC. They received it from the EEOC? Yes, Your Honor. EEOC sent it to them? Precisely. The university said, let's go through mediation. There was a mediation on February 17. It was not successful. On May 26, they brought charges of termination. Professor Coursey maintained that he was not guilty of terminable misconduct or of incompetence or any of the other bases asserted for the termination. He took a grievance and came before a grievance committee. During the grievance committee proceedings, counsel for the university introduced into evidence a copy of his EEOC complaint and explained to the committee that the case only went forward because Professor Coursey had failed to settle through the EEOC mediation. Ultimately, that committee disagreed with the first committee and found that although Professor Coursey had had a long and in many ways distinguished career with the university, that the allegations of incompetence and misconduct, which primarily centered around grades and disagreements about grades and classroom issues, were well founded. He said he was going to give good grades to the athletes or something, right? That was the contention, sir. That's right. And in fairness to his accusers, Professor Coursey was the athletic director. He was the chair of the physical exercise department. He was the dean of that school. And he certainly was invested in athletics, but his position was that he did not give undue preference to athletes. In any event, the termination stuck. Here we are. What was the purpose of the introduction of the EEOC complaint against him before the grievance board? Well, Your Honor, I maintain that… What was the explanation for it, according to the record? According to the record, the explanation was that there was no explanation. It was just, here's what Coursey did.  He entered it into evidence as an exhibit, sir. It appears at pages 372 through 375 of the record. It was, in my experience, bizarre. The attorney for the university introduced it formally as an exhibit. It was received… Well, did the university attorney say why it was… what its relevancy was? The explanation… We're going to fine him for filing an EEOC complaint? Is that the purpose of it? Not that I can tell, sir. The only explanation that I perceive is that she wanted the committee to know that he had then participated in mediation, which he… which did not result in his agreement to settle the claim. And that, here we are. He wouldn't settle his dispute with us, so here we are, implying that it was his own fault. The school's position, though, is that his erratic behavior gave them a business reason to have him evaluated, an evaluation that he refused to take when he was told to do that. And their position is that even if you get to the point, the question of whether or not… as a district court family… Right. As to the EEOC complaint, there is still plenty in the record to show that there was a business reason for this termination. Well, actually, respectfully, Your Honor, that isn't quite their position as I understand it. Their position was, look, this is what the committee recommended, so we're sending you for an evaluation. The letter from the President appears in the record at page 321. It's cryptic. It takes the position that she is simply following their recommendation. And she persisted in that position even after she was told by the committee that they didn't make that recommendation. Then your position, though, is that any time somebody wants to check to see if something's wrong with somebody, they have perceived them as having something wrong with them, or they're now suddenly perceived as disabled? Respectfully, Your Honor, I don't believe that is a correct assessment of the law at this point. No, but I'm saying what you're saying is that he was… one of your arguments is that the university perceived him as having a disability. Right. And I'm contending, Your Honor, that the point you've identified is part of the body of evidence supporting that conclusion. The draconian way in which the university dealt with this gentleman, escorting him off campus with a uniformed guard… Does that really have something to do with this? I think it does, Your Honor. He was presented with a letter saying, you've engaged in inappropriate behavior in the classroom, and we're having it investigated. Meanwhile, you are to leave the campus physically. Well, shucks. I mean, the guy had been a professor for 38 years. If he didn't, at this point, as a tenured full professor who had been the dean, know how to conduct himself in the classroom, there were an issue. Presumably, they would have sat down with him and talked about it. And the fact that, instead, they had him physically escorted off campus and directed to stay away until further notice suggests that they perceived him as unstable, not simply as acting a little inappropriately. That overkill, coupled with a clearly disingenuous requirement that he submit to a fitness for duty evaluation, suggests that they are at least professing to regard him as disabled. The law, as I understand it, requires that the fitness for duty requirement be based upon a reasonable belief arising from objective evidence. And I have scoured the record in this case. I've lived through it. And there is not one, what's the word, scintilla that would support the conclusion, the objectively reasonable conclusion, that he ever threatened anybody, that he ever engaged in conduct which he reasonably, that an objectively reasonable person would regard as threatening or intimidating. The worst that could be said is that he raised his voice on occasions. Let me interrupt you. Based on Judge Cogman's question, which I was going to ask myself as a matter of fact, maybe great minds think a lot, or not. You may be insulted. I'm having trouble understanding where the line is that you're drawing because, as I understood your answer to Judge Cogman's question, you would agree that simply asking that someone have a mental evaluation does not automatically mean they are regarded as disabled. You have to look at the circumstances. So it's got to be more? It has to be more. More than that. And you say that the more than that is the fact, was the manner in which he was escorted off campus and the predicate. That shows he is regarded as disabled? Well, under the circumstances where they gave him a letter saying you've engaged in inappropriate behavior in the classroom, which would, to my mind, suggest a 15-minute conference about you need to be a little more sensitive. Instead, it was coupled with his being frog-marched off campus. Coupled with the disingenuous predicate for the request. The request has to be genuine. It has to be based on a reasonable belief arising from objective evidence. So if the reason is false, what do you contend is the real reason? I think they wanted to get rid of him. He's a pretty expensive guy. They just wanted to get rid of him. Right. But they had to have some reason for just wanting to get rid of him. Right. What is that? He's a tenured professor. My position is that that's improper, but my position today in terms of the analysis under these ADA and rehab concepts is that it's pretextual. That they don't have a legitimate non-retaliatory, non-discriminatory request. It's pretext for what? Pardon me? It's pretext for what? What do you contend is the real reason that they want to get rid of him? I don't really make a contention because I don't really know. You don't know why they wanted to get rid of him, but it was not this. Is that what you're saying? Clearly, you're right. I don't think... You think they wanted to get rid of him because he filed the EEOC complaint? I think that... Well, they started it before he filed it. All that they started before he filed it was physically removing him from campus. They pursued these removal charges on the theory they wanted to get him out. And the committee came back and said, well, it's not right. There's really no basis for it. And they said, well, we're going to defer acting on the committee recommendation and see what happens. And they never acted upon it. He was sort of in limbo pending whatever action the president ultimately was going to take. And the action that she ultimately took was to fire him. But that didn't actually proceed until she got notice that he had filed an EEOC complaint. Was that really the basis of what you're up here on? The fact that they used the EEOC complaint against him? That's a big part of it. That's a big part of it. Yes, sir. It is. When did this tongue in the ear event happen? Well, I don't know exactly when it happened, but clearly... The target is being escorted off the campus. Well, they didn't even know about it until shortly before the hearing concluded. And the law is that they have to base their fitness for duty request upon information known at the time, obviously. But I guess my point really is in evaluating the propriety of that request. You look at the information known to them at the time. Their position was, well, the reason we're bringing this up at the last minute is because we only just found out about it. Okay. He denies it. The witness maintains that it happened. The committee said, well, we think she's credible, and that's where the matter rested in terms of the burdens of proof. But in terms of the analysis of a fitness for duty evaluation, I would admit to you that is eccentric behavior. But it's undisputed that they knew nothing of it at the time they requested the fitness for duty evaluation. So it can't factor into our analysis of the reasonableness of that request. So, at bottom, our contention is that their conduct, beginning with his removal, reflected at least a professed perception of him as not merely incompetent or acting improperly, but as erratic, as eccentric, as unstable, requiring physical removal, which happened. They submitted him to what is clearly a disingenuous strategic request that he undergo an evaluation. And then when he complained about it, and I think his complaint was objectively reasonable, which is the standard, within three months, they had initiated his termination, something which had been on hold forever. So, in a nutshell, that's our case, Your Honor, and if there are no questions, I'll retire. Well, you've got some time remaining for reply after we hear from Ms. Casers. Thank you, sir. Yes. Good morning. May it please the Court. The District Court properly granted the University's motion for summary judgment based on the undisputed evidence in the record. Importantly, Dr. Corsi does not dispute the conduct that is at issue in this case. And I'd just like to give a little bit of the timeline of what happened, because I think opposing counsel left out some important facts that led up to his removal on the request for a fitness evaluation. And that was that in late December 2008, early January 2009, a dozen students brought complaints about Dr. Corsi's teaching and erratic grading, arbitrary grading issues, the fact that he wouldn't speak to them about it, that they weren't getting work returned, that the grading seemed to be arbitrary. They brought that to the attention of Dr. Heimdall, who was the chair of the department. Then in mid-January of 2009, Dr. Heimdall emailed Dr. Corsi and said, Here are these complaints that we've had about you. I would like to discuss them with you. Dr. Corsi refused to discuss those complaints. And instead, again in late January of 2009, on the first day of class of the spring semester, he screamed at his class. He retaliated against them for complaining about him, told them they couldn't complain about him because he was the senior faculty member on staff, and therefore he was untouchable by the university. And three faculty members heard him screaming at his class, and one student in the class went and reported to Dr. Heimdall that she was terrified of Dr. Corsi and that she was considering switching majors and possibly leaving the school. It was only after that undisputed misconduct, several days later, that Dr. Corsi was removed from the university and suspended from his duties. And certainly a university has a right and indeed an obligation to protect its students' safety and the safety of members of the community by removing somebody who is engaged in threatening conduct. So that is why he was removed from campus, not simply because students had complained, but because he had retaliated against those students in a threatening way. And then Dr. Blanchard, the dean of the school in which Dr. Corsi taught, was charged with investigating the incident. And in late February 2009, after interviewing Dr. Corsi, Dr. Blanchard reports that his speech is incoherent, that he seems to be living in some sort of different reality, and that he's not surprised why people are afraid of him. Also during this time, Dr. Corsi is exercising his right under the grievance policy to go before a grievance board. And that board does not absolve him of misconduct. Rather, they find that the university didn't comply with all of its policies and procedures. And one thing that they note in their report was they have a question. Was Dr. Corsi given any prescribed examination to confirm the need for removing him? So this is all objective evidence that the university president, Dr. Thompson, had before her when she made the request that Dr. Corsi undergo a mental, in her first letter it says medical slash mental health evaluation. In subsequent letters to Dr. Corsi when he resists, it's limited to a mental health evaluation. They list the name of a mental health provider that they want him to get in touch with and schedule an appointment with. And she was certainly, that objective evidence certainly gives rise to a reasonable assumption that, or belief, that this person is not capable of performing the essential functions of his job and therefore a fitness for duty evaluation is warranted. And it's an objective test. So it really, we don't look into, courts don't look into the subjective reasons why an employer took that action. It's really based on all of the objective evidence and was it reasonable. And certainly when you have a professor screaming at his students, threatening them that they are not allowed to complain about him, that he's untouchable, that the dean of his school reports that he seems to be out of touch with reality. This all gives rise to a reasonable belief that he is not able to perform the essential functions of his job. One of which, at any university, as the district court found, would have to be providing a safe academic environment for students. Was it really an attorney for the university that thought it was a good idea to put the EEOC complaint into evidence? Apparently. I would just like to point out that it's true. Apparently what? I'm answering Judge Cogburn's question. Apparently. It's true that a lawyer for the university admitted into evidence to the termination board. So this was, this termination board was convened after the president had already decided to terminate Dr. Corsi. This was a grievance procedure, so the EEOC complaint, there's no evidence in the joint appendix that Dr. Thompson, President Thompson, when she approved the charges for termination, that she was presented with this. My question is why was it introduced? What legitimate reason could there be for introducing it? The only one reason that I could discern from the record, from the joint appendix, is that on joint appendix 370, at the beginning of this hearing, the, I'm not sure if it's Dr. Corsi or if it's counsel for Dr. Corsi says, now the guy who's been here longest at your academic community on these grounds with no attempt at remediation, no attempt at conflict resolution, no attempt of anything other than dragging him off campus and admitting him only for the limited purpose of being fired. And it could be that that sort of opened the door to, well actually we did attempt to mediate with him as part of his EEOC proceedings, but that was fruitless. And so we did attempt to have some sort of mediation with Dr. Corsi. So that would be certainly one reason for, introducing the fact that they had mediation based, or during the EEOC proceedings, that would be why, I guess a legitimate reason for admitting that into evidence. You said that could be a legitimate reason? Yes. But it was not articulated as the reason. It's not articulated in the joint appendix. It's not articulated at the hearing. It doesn't appear to have been articulated at the hearing as to why. If that was the reason. But just based on an objective reading of the record, I think that makes it legitimate. He raised this issue that the university had failed to attempt any remediation or conflict resolution with him, and they had. The university had, but the EEOC complaint was his complaint, not the university's. I mean it shows that he was filing a complaint.  Of misconduct or inappropriate handling by the university. He was complaining against the university. Well, that's true. That doesn't show that the university was trying to mediate or something. Well, but they did. He was filing a complaint against the university with the EEOC. Of course. And the federal law is you can't retaliate against somebody for filing an EEOC complaint. But you can mediate with a person as part of the EEOC proceedings. Does that show anything about mediation? I'm sorry. Does it show something about mediation, the EEOC complaint? Does it show something about mediation? No. But the mediation arose during the EEOC proceedings, and I think that was a legitimate reason for introducing that would be that we know, look, we did attempt to mediate with him. We did attempt some remediation. Well, assume that was your explanation. There's no explanation. That shouldn't have been done. That what you got is it was erroneously used against him. Or do you fall back on some kind of harmless error doctrine? Well, first of all, the just to I just want to be clear that the that the that the employer, the person who made the decision to terminate Dr. Percy, Dr. Thompson, that happened before this grievance board was convened. So she there's no evidence in the joint appendix that she was that that she was considering the EEOC complaint when she. But she is Dr. Thompson, Dr. The president. Exactly. She made the final decision. She makes the final decision. He does get a grievance procedure. And that's at that grievance procedure is when the EEOC complaint was admitted into evidence. And the grievance board said where he should be terminated for his misconduct. Correct. And they didn't say didn't mention the EEOC complaint. Absolutely. Judge King. So wouldn't it be fair reading that the part of the misconduct was following the EEOC complaint? No. Well, they didn't say one way or another. They didn't exclude it. And they offered it in evidence. They put it in evidence. They didn't exclude it, but they. And that was part of the evidence. Judge King, that board did articulate in great detail all of the reasons for that, that they found that to uphold the termination. And and these included things like that. He stuck his tongue in a colleague's ear that he that lack of collegiality, a pattern of disrespectful interactions with supervisors being verbally abusive towards students. All that is the misconduct that you're aiming at. But that is in a in a the Supreme Court recently held that in a retaliation case. There is no mixed motive retaliation. So you have to show that the retaliation was a but for cause of the adverse employment action. I mean, but yeah, but for cause of the termination. And here he can't do that because there are all of these legitimate nondiscriminatory reasons for terminating him. That was those were the but for cause of the termination. Those were the charges that were filed for his termination that I believe it was Dr. Williams, the vice president of academic affairs. Those were the charges he filed. Those were the charges that President Thompson. Accepted and initiated his termination. So at that point in time, when the university actually makes the decision to terminate him, that the EEOC complaint is not in the record is not being considered. There's no evidence that they were considering the EEOC complaint. The evidence is only that they were considering the litany of misconduct. And that's what the hearing was about. And that's what the hearing was. And when they had the hearing, they presented into evidence the EEOC complaint. To support their position that he had done these things. Presumably they just offered it. Well, it's not. I don't think we can presume that they used it to to support. They didn't limit their position. They didn't limit its use. It wasn't minute. There's unlimited purpose. It wasn't. Well, there's no. Explain. I mean, certainly in a retaliation context, the assumption is that the employer knows that the employee has has complained. So it's not it's not a secret. It's not something that the employer doesn't already know about. In every retaliation case. The employer has in his or her mind or in its in its mind that some complaint has been filed. At least that has to be the allegation for for any retaliation complaint to go forward. So there's really no there's no authority. I didn't cite any cases or any authority that that that can't be in the mind of the decision maker when they decide to terminate an employee who is engaged in a litany of misconduct, including threatening students for complaining about him for retaliating against students. Ironically, really what you can't do, though, is you can't defend that being put into evidence that here, what you're saying is that that is that there's not a but for with regard to that. There's not a terminating. They were going to terminate him anyway for the other conduct. And the inclusion of this had nothing really would have not didn't change anything about what the university. It didn't change anything. Exactly. Your honor didn't change anything about what the university was doing. The charges that were brought against him in writing didn't mention the EOC complaint that President Thompson's letter accepting those charges and initiating the termination didn't mention the EEOC complaint. It's only after that when Dr. Corsi brings a grievance. And again, in their in their in their litany of findings of misconduct, professional misconduct, incompetence and insubordination, they don't mention that you really I mean, you just can't. It's not something you should try to defend. It was a swing and a miss to put that in. OK, I accept that, your honor. But again, in the retaliation context, it has to be a but for cause for the adverse employment action. And here, clearly, I thought that's what you would say. We shouldn't have done it and we can't defend it. But it but it doesn't because there's no it's not a reason for you all to vacate that. It's not a reason to vacate the. That's what it's grand. So my judgment. So that's what I characterize as harmless error. I mean, that may be more of a. Well, then I'm going to accept that that would be it shouldn't have been done. I don't want to be done. I'll certainly we don't want to bring that kind of thing. Even if we agree with your position on the merits, we shouldn't be approving that kind of thing. When somebody files an EOC complaint, you're having a hearing when the discharge, not that they put the EOC complaint in there. That could be your honor. Stifle people exercising their EOC rights. Yes, your honor. I would just like to point out again briefly that the termination proceedings were initiated and approved before without any without any mention of that of that EEOC of that EEOC complaint. If the court has no further questions, I'll rest on the brief. Thank you very much. We ask that you affirm the judgment of the district. Mr. Cocke, you reply. Just to be clear, at least in theory, Mr. Horsey wasn't terminated until after the committee had made the recommendations. I then got a hearing in front of the president to argue why she shouldn't adopt the recommendations. Then she subsequently came out with a written decision saying, you know what, I'm going to adopt their recommendations. So you had a hearing. You went to the president's office and argued the thing? Oral argument, very much like today. Oral argument before the president? Correct, sir. Was the EEOC complaint argued? The EEOC complaint was not argued. Was what? I don't recall it being argued. It was not argued? No. Okay. I understand the gravamen of the complaints against Dr. Horsey as they were presented by the university at the committee hearing. It was that he had become cantankerous and irascible and outspoken and rude and that this had affected his conduct and his competence. And the EEOC complaint sort of came in with a lot of other stuff all designed to my perception to show that he was a critical, cantankerous, hard-to-get-along-with guy. And that position was ultimately adopted by the committee who chided him for being disrespectful and discourteous and not collegial. And in my view, it's impossible to separate the strands of evidence leading to that decision because they do not separate them in their decision, nor does the president separate them in her decision, although the complete record was made available to her, and my understanding is that she at least professed to have reviewed the entire record, all the exhibits, the proceedings, gone over the whole thing. So although I'm painfully aware of the recent Supreme Court decision on retaliation but for causality and so forth, I don't see how that gets my colleague here to harmless error because it is simply impossible to tell whether the EEOC complaint significantly impacted the members of the committee or President Thompson or any part of the decision-making process. So respectfully, I would ask that you vacate the decision below for that reason but also because, as I argued in my brief, I think the district court applied the old improperly heightened standard in analyzing our regarded as claim. I also feel that the fitness for duty evaluation, although I certainly acknowledge the reasoning that Judge Cogburn identified, that it wasn't the requirement was not imposed at a time and under circumstances suggesting that it was actually based on a genuine reasonable belief supported by the evidence. If it had been, instead of removing him from campus, they would have said, look, go get a fitness for duty evaluation. They didn't do that. They kicked him off campus. Three months went by. The committee came back. They said, well, we don't think that was right. Six more weeks go by and finally, very belatedly and I think strategically, the President says, well, I'm going to adopt the recommendation. Go get a fitness for duty evaluation. If the concern supporting the fitness for duty evaluation had been legitimate, bonafide, they would have asserted it up front instead of when it appeared tactically helpful. The bottom line, if there is one in this case, Your Honors, would be that the university, and I'll acknowledge, I haven't deciphered what is really going on here, but I think it's crystal clear that at some point the university decided to sort of bring Professor Corsi into line and to improve his conduct. And when he was resistant and refused to submit and to go along nicely, they fired him. Thank you for your time, gentlemen. Thank you, Mr. Cockney. We'll come down and greet counsel and then we'll take a break so that Judge King can go help another panel. This court will take a brief recess.
judges: William B. Traxler, Jr., Robert B. King, Max O. Cogburn Jr.